UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
                                                        :
UNITED STATES OF AMERICA,                               :
                                                        :
                                                        :      **MEMORANDUM & ORDER**
                -against-                               :
                                                        :      07-cr-730 (DLI)
TERRY CROSS,                                            :
                                                        :
                                                        :
                                Defendant.              :
                                                        :
------------------------------------------------------- x

**DORA L. IRIZARRY, United States District Judge:**

      Defendant Terry Cross is charged with knowingly possessing marijuana with the intent to distribute, knowingly possessing a firearm in furtherance of a drug trafficking crime, and being a felon in possession of a firearm, in violation of 21 U.S.C. § 841(b)(1)(D), 18 U.S.C. §§ 924(c)-(1) (A)(i), 924(a)(2), 922(g)(1), and 3551 *et. seq.*, respectively. He seeks to suppress his post-arrest statements and $176 that the police recovered from him. He contends that the statements and money were the products of a warrantless arrest without probable cause, thereby violating his rights under the Fourth, Fifth, and Sixth Amendments of the United States Constitution.[1]

      The court held an evidentiary hearing on Cross's motion over the government's objection.

---

[1] On March 24, 2008, the court denied defendant's motion to suppress certain items recovered inside his residence at 551 Warwick Street, Brooklyn, pursuant to the execution of a search warrant. The court found sufficient probable cause for the issuance of that warrant. Thus, the search of the residence was legal and anything recovered inside the residence is admissible. Defendant also seeks an order pursuant to *Roviaro v. United States*, 353 U.S. 53 (1957), requiring the government to provide the identity of the confidential informant ("CI") in this case or produce the informant for examination. The informant had died before the hearing was held on the remainder of defendant's motion to suppress. Thus, the court need not decide this issue at this time.

The hearing began on June 10, 2008 and continued on July 24, 2008 and September 23, 2008.[2] Officers Edward Babington and Victor Troiano, Detective Jason O'Neill, and Sergeant David L. Rosiak of the New York Police Department ("NYPD") testified for the government. Cross also testified. The police gave inconsistent accounts of the circumstances surrounding Cross's arrest. Their accounts also conflicted with defendant's account. It falls to this court to assess the credibility of the witnesses. *See, e.g.*, *United States v. Yousef*, 327 F.3d 56, 124 (2d Cir. 2003) (citations omitted). For the reasons set forth below, the court cannot credit the testimony of the police. The court credits Cross's statements regarding the events immediately surrounding his arrest on August 23, 2007. As a result, the court finds that the police did not have probable cause to arrest Cross. Accordingly, the motion to suppress is granted.

**I.      Background**

On August 23, 2007, officers from Police Service Area 2 ("PSA 2") of the NYPD executed a search warrant for 551 Warwick Street in Brooklyn, New York, issued by a Justice of the Kings County Supreme Court. Earlier that August, the police, through the CI, had arranged three controlled purchases of marijuana from that address. The scope of the search warrant was confined to the premises of the address and to anyone seen entering or leaving it. It did not specify Cross or any other individual by name or description. Inside the home, the police found a small bag of marijuana and five rounds of ammunition. In the backyard adjacent to the backyard of 551 Warwick Street, the police discovered a gray plastic bag containing a KBI Makarov 9x18 semi-automatic pistol, some scales, and more marijuana. While executing the search warrant, the police arrested Cross several houses away, on Ashford Street, which runs parallel to Warwick Street. (*See* Def. Ex. A (Google Map and satellite photo of the area around

---

[2] "Tr." refers to the hearing transcript from the first two days of hearings. "Tr. 2" refers to the transcript from the remaining day.

2

551 Warwick Street).) The government contends that the police had probable cause to apprehend Cross because the CI had identified Cross as the marijuana dealer at 551 Warwick Street through a photo-array identification. Additionally, the government claims that Babington and Troiano's observations during the execution of the search warrant provided independent probable cause for the arrest. Defendant argues that the government has failed to establish that the photo-array identification had occurred. Additionally, he questions the veracity of Babington, Troiano, and Rosiak's testimonies regarding the execution of the search warrant.

### A. The Government's Account

Babington testified that the investigation of this case began when the CI approached and informed him that an individual with a firearm was selling marijuana from 551 Warwick Street. (Tr. at 23.) The police made three controlled buys of marijuana at that location in $50 increments. (Tr. at 24-25.) Babington said the CI identified the seller as "T or Terry" and pointed to Cross's picture in a photo array. (Tr. at 24-26.) Babington's application for the search warrant did not mention Cross or the photo-array identification. (*See* Ex. B to the Gov't June 17, 2008 Letter.)

Babington was among the fifteen or more officers who executed the "no-knock" search warrant on the morning of August 23, 2007. (Tr. at 45.) He and Troiano stood in front of the two-story brick townhouse and handled "front-window security" while a team from the Emergency Services Unit ("ESU") attempted to open the front door. (Tr. at 27-28.) Babington and Troiano were responsible for monitoring the front windows of the townhouse for possible threats to the ESU team. (Tr. at 28.) As they waited, Babington recalled hearing a bang in the backyard and some dogs barking, so he directed Troiano to investigate. (Tr. at 32, 51.)

Troiano testified that he did not recall hearing noise from the back or being directed by

3

Babington to investigate the backyard. (Tr. at 115-16.) He said he went around to observe the rear of the house when it appeared that the ESU team was having trouble opening the front door. (Tr. at 116.) The townhouses along Warwick Street are attached, with chain-link fences dividing each lot. (Tr. at 109-110; *see also* Def. Ex. A.) Therefore, in order to walk behind the row of houses, Troiano had to walk to the end of the row, turn left onto a private driveway, and enter into another backyard. (Def. Ex. A.) He testified that, from there, he could see, without the aid of binoculars, through several fenced yards into the backyard of 551 Warwick Street. (Tr. at 110-11.) Waist-high bushes and six-foot chain-link fences separating the backyards partially obstructed his view. (Tr. at 104-106.) Troiano, who is five feet eight inches tall, did not stand on a trash can or climb onto one of the fences. (Tr. at 111.) Through the layers of chain-link fences, he allegedly saw a man in the backyard of 551 Warwick Street. Troiano described that man as about six feet tall, wearing a knit cap and brown sweatshirt. (Tr. at 104.) He could not see the man's facial features but described him as looking very "antsy" and nervous. (*Id.*) He saw the man make "an upward motion with his arm" toward the back corner of the yard but could not tell what was in the man's hands because of the bushes that obstructed his view. (Tr. at 105.) Then, the man began to move north, further away from Troiano, by jumping across the fences of other backyards behind the homes on Warwick Street. (Tr. at 106.) At some point, the man turned eastward toward Ashford Street.

Troiano radioed his observations to Babington, who then headed north on Warwick Street toward Sutter Avenue. (Tr. at 33.) When Babington heard that the man had turned east toward Ashford Street, he too turned east on Sutter Avenue and then turned north onto Ashford Street. (Tr. at 54-55.) Babington then proceeded to "walk" down the block and saw a male, fitting the description that Troiano provided, appear from a driveway. (Tr. at 55.) The man was out of

breath, sweaty, and appeared nervous. (Tr. at 34.) Babington asked the man to give his name and where he was coming from. "Terry," the man responded, and motioned with his head as if he had come from the back of the home. (*Id.*) Babington then asked for and received the man's identification, a New York State driver's license, indicating that he was Cross. (Tr. at 35.) He then ordered Cross to turn around and handcuffed him. (*Id.*) Babington testified that he arrested Cross because: (1) he recognized Cross from the CI's photo identification; (2) Cross matched the description of the individual fleeing from 551 Warwick Street; and (3) Cross did not give a good reason for his presence in the driveway. (*Id.*)

Babington testified that, as he made the arrest, Rosiak and Officer Velez pulled up in a car, and Cross was placed in that car. (Tr. at 36, 37.) Later, Babington identified the car as an unmarked gray minivan. (Tr. at 61, 210.) Babington testified that, after dropping Cross off at 551 Warwick Street, he retraced Cross's steps to a fence and saw more footprints on the other side leading to another fence. (Tr. at 36, 64.) Babington said that, before returning to the precinct with Cross, they first drove to the front of 551 Warwick Street. (Tr. at 37, 62, 65, 211.) Cross said that he did not live at that house but was just watching the residence for a friend, and that only the items on the back table belonged to him. (Tr. at 37-38.) Babington went inside the house and recovered twenty-three ziplock bags of marijuana and several rounds of ammunition. (Tr. at 40, 68.) In a neighbor's backyard directly behind the residence, he recovered two bags, one containing a large bag of marijuana and the other containing a loaded firearm, more marijuana, some scales, and packaging. (Tr. at 40-41.) The government separately represented that the search of the house also uncovered an electricity bill addressed to Cross at 551 Warwick Street, but the police did not seize it. (Gov't Feb. 19, 2008 Resp., at 6 n.1.)

Rosiak gave a somewhat different account. Before ESU attempted to gain entry, he

5

assigned two officers in a van to guard the Ashford Street side of the block. (Tr. at 181.) When Babington headed north on Warwick Street, he and Velez drove south in a squad car, turned left onto Blake Avenue, and then turned left again onto Ashford Street, where Babington was arresting Cross. (Tr. at 183.) Rosiak asked Cross where he had come from. Cross replied that he had been buying loose cigarettes. (Tr. at 185-86.) Babington does not remember this exchange. (Tr. at 210.) Then, according to Rosiak, Cross was placed into the van on Ashford Street and taken "straight" to PSA-2. (Tr. at 188-89.) Rosiak said he was "a hundred percent sure" of this fact when asked by the government on redirect. (Tr. at 190.) He also mentioned that a female police officer, in addition to Velez and Babington, also rode in the van. (Tr. at 183.)

The government's 3500 materials contain an inventory report completed by Troiano, which indicates that $176 in cash was recovered from Cross. Troiano denies ever having searched Cross. (Tr. at 142.) Rosiak testified that Babington searched Cross at the time of the arrest but "no contraband or anything to that effect" was recovered. (Tr. at 188.) When confronted with this inconsistency, Babington explained, "Troiano was the main inventory officer. So maybe when I filled out this form I incorrectly put his name down . . . . Probably just a mistake." (Tr. at 213.)

After the police brought Cross to the station, O'Neill interviewed him. O'Neill testified that, at the outset of the interview, he explained to Cross his *Miranda* rights. O'Neill then showed Cross a *Miranda* waiver sheet. (Tr. at 76.) The sheet contains questions for confirming that a defendant waived his or her rights to remain silent and have attorney representation. (Tr. at 76; *see also* Gov't Ex. 4.) Cross wrote "yes" and his initials next to each question. Cross then orally confessed that he was a low-level drug dealer who the police awakened that morning. (Tr. at 79-80.) He fled through the back door, tossed the marijuana and firearm over the fence, and

was then arrested on the other side of the block. (Tr. at 80.) When O'Neill asked about the firearm, Cross became silent and refused to provide a written account of his oral confession. (Tr. at 81-82.)

### B. The Photo Array[3]

The court extended the scope of the suppression hearing to include the photo-identification procedure because Babington claimed that his decision to arrest Cross was based, in part, on the CI's prior photo-array identification. Babington initially testified that he did not preserve the photo array. (Tr. at 55.) He said Rosiak had prepared the array, using photos from a database. (Tr. at 56-57.) He described the photo array as having six photographs on six different pieces of paper. (*Id.*) Cross's photo was included in the array because a utility bill for 551 Warwick Street bore his name. (Tr. at 58.) After the June 10, 2008 hearing, Babington changed his testimony and said that the photo array was actually six pictures printed on a single sheet of paper. (Tr. at 200-01.) On June 17, 2008, the government provided the court with a copy of what it claimed was the photo array in question, with six pictures, including one of Cross, with the word "BLACK" handwritten underneath. (*See* Ex. A to Gov't Letter of June 17, 2008.) It was not dated, signed by the witnesses, or identified in any other manner. Much of the hearing on July 24, 2008, concerned this photo array.

Rosiak testified that he was the lead investigator of the alleged marijuana sales transacted at 551 Warwick Street and directed all three of the CI's controlled buys. He learned of Cross when he contacted Consolidated Edison to determine the names of the utility customers at that address. (Tr. at 148-49.) He collected mug shots of Cross and five other individuals with similar physical attributes from a police database and assembled them in a Microsoft Word document.

---

[3] Because the CI is deceased, the court does not have his or her testimony as to what photo-identification procedure, if any, was used.

(Tr. at 150-51.)

Rosiak testified that he never received formal or specialized training on the presentation of photo arrays (Tr. at 174-75, 197) but had prepared a dozen in 2007 (Tr. at 195). He gave a very rudimentary description of the NYPD's official procedures for conducting photo arrays and could not recall the procedures for showing a photo array to the witness and how identifications should be memorialized. (Tr. at 195-96.) He testified that he had never seen a NYPD photo array with a caption at the top and instructions printed on the bottom. (Tr. at 174.)

He printed out the photo array and presented it to the CI with Babington also present. He asked the CI to write his confidential name underneath anyone he recognized. He failed to inform the CI that it is possible that none of the photos related to the investigation. (Tr. at 175.) The CI wrote "BLACK" underneath Cross's picture. (Tr. at 153.) Rosiak testified that he showed the CI the photo array two or three days after the first controlled buy. (Tr. at 157, 160.) Babington testified that the photo array was shown to the CI after the second controlled buy. (Tr. at 207.)

Rosiak initially testified that the CI gave him no other identifying information about Cross other than the photo-array identification. (Tr. at 159.) Later, on re-direct, he testified that the CI mentioned the name "Tyrell" to describe Cross. (Tr. at 193.) He also did not inquire into the relationship between the CI and the seller at 551 Warwick Street. (Tr. at 166-68.) He did not write a summary of or otherwise document the identification. (Tr. at 176.) He admitted that it was an "oversight" on his part. (Tr. at 152.) Rosiak testified that he initially stored the photo-array sheet in the case folder, but it disappeared. Only when responding to the government's request following the June 10, 2008 suppression hearing, did he find it again in a file cabinet in his office. (Tr. at 177.) He said it was stowed in a separate manila envelope with some other

documents not pertaining to this case. He blamed the mis-filing on "sloppy" paperwork and lack of office space. (*Id.*)

### C. Cross's Account

Cross is a thirty-eight-year-old male who lives at 520 Warwick Street with his mother. He also rented a room at 551 Warwick Street because his mother did not like him having "a lot of girlfriends." (Tr. 2 at 35.) On the morning of August 23, 2007, he first encountered the police in front of 472 Ashford Street, the residence of his girlfriend Christine. (Tr. 2 at 5, 35-36.) He said he had called her earlier that morning, but she did not answer. He went to her house, rang the door bell, and sat on the stoop, waiting for her to come downstairs. (Tr. 2 at 5, 37-38.) When no one answered, he headed for another girlfriend's house but returned when he heard the door open. (Tr. 2 at 6, 38.) As he was about to re-enter the front gate at 472 Ashford Street, he saw two people turn onto Ashford Street from Blake Avenue and run toward him from the south. (Tr. 2 at 6-7.) He saw Troiano running by and looking at him. Troiano stopped at the corner of Sutter Avenue and Ashford Street, then turned back and ran toward the middle of the block, passing in front of Cross again. (Tr. 2 at 7-8.) As Cross left 472 Ashford Street a second time to head toward his other girlfriend's residence on Sutter and Shepherd Avenues, Troiano ran up behind him and demanded to see his identification. (Tr. 2 at 8-9.)

Cross asked for the purpose of Troiano's request. Troiano replied that there had been a robbery around the corner. (Tr. 2 at 8.) Cross then asked whether he fit the description of the suspect and whether he could hear the request over the radio. (Tr. 2 at 8-9.) Troiano became evasive and asked Cross where he had come from. At that point, Rosiak, who was further south on the block peering into another gate, came up to the two of them. (Tr. 2 at 9.) Cross responded that he was "on New Lots and Ashford," buying loose cigarettes. (Tr. 2 at 10.)

9

Troiano then put his hand on Cross's chest and again demanded to see his identification. Cross handed over his wallet. (*Id.*) Troiano then read Cross's name and driver's license number over the radio and asked for a search of the house for mail bearing that name. (Tr. 2 at 11.) When confirmation came over the radio that the police had found a utility bill matching Cross's name, Rosiak and Troiano handcuffed Cross, loaded him into a black and white van, and drove to 551 Warwick Street via Blake Avenue. (Tr. 2 at 12.)

When they arrived, Babington came out of the residence and spoke to Rosiak and Troiano before heading into the van. (Tr. 2 at 13.) Babington said, "I found the shit on the table and on top of the china cabinet" and demanded to know, "where the rest of the shit is at [so] I'll see what I can do with you with the D.A." (Tr. 2 at 14.) Cross replied that he did not know what Babington was talking about and had nothing to say. Then, Babington turned and threatened him stating, "[a]ll right, you want to make it hard for me[?] I'm going to fuck your shit up for you. Watch what happens when you get down to the precinct, when you get down to court." (Tr. 2 at 14-15.) Babington then left the van. Ten minutes later, Troiano and a female officer drove Cross back to PSA 2. (Tr. 2 at 15.)

After they arrived at the precinct, O'Neill took him out of his cell. O'Neill wanted to interview him. Cross claims that he asked for a lawyer and refused to talk. (Tr. 2 at 16-18.) O'Neill told him that a lawyer would be available to him at Central Booking, but he first wanted to speak informally off of the record. (Tr. 2 at 18.) He then struck up a conversation about the scar on Cross's face. (Tr. 2 at 18-19.) Later, O'Neill presented Cross with a *Miranda* waiver form and called it an "informational document." (Tr. 2 at 19-20.) Cross asked about the nature of the information and O'Neill said it was to show the District Attorney that Cross had been questioned about the case. (Tr. 2 at 20.) Cross claimed that O'Neill would intersperse questions

10

about his personal life with directions for him to write "yes" and initial specific questions on the waiver form. (*Id.*) Cross claims that he never got to read the questions because O'Neill held the form. (*Id.*) He thought it was a questionnaire regarding his identity and residence. (Tr. 2 at 21.) He contends that he did not know what he was signing.

## II. Discussion

Probable cause "exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983). In the absence of probable cause, "the arrest is illegal and any obtained evidence is subject to the exclusionary rule." *United States v. Torres*, No. 05-CR-838, 2006 WL 1982750 at *2 (E.D.N.Y. July 13, 2006). When a motion to suppress is based on an illegal warrantless arrest, the government bears the burden to show that there was probable cause for the arrest. *See United States v. Pena*, 961 F.2d 333, 338-39 (2d Cir. 1992). Here, the submissions raise two dispositive issues regarding probable cause for the August 23, 2007 arrest: (1) whether the photo-array identification ever occurred; and (2) whether the events immediately preceding the arrest established probable cause for the arrest. The court finds against the government on both.

### 1. The Government Failed to Establish That the Photo-Array Identification Occurred.

The evidence raises substantial doubt as to whether the photo-array identification ever occurred. As an initial matter, the circumstances under which the government produced the array are suspicious. The government did not originally produce the photo array with its Rule 16 discovery or 3500 materials. Rather, it produced the array after the first day of the suppression hearing and shortly prior to Rosiak's testimony. The government's explanation for this delay is

implausible. Rosiak claims that he initially filed the array in the proper case folder after the identification. (Tr. at 176-77.) Somehow, the array was removed from that folder and ended up in a "loose folder" in a file cabinet with several other documents not pertaining to this case. (Tr. at 177-78.) He blames the misplacement on his sloppiness and his cramped work space. (*Id*.) The court is unpersuaded.

First, Rosiak did not explain how the array became misplaced. Even though he testified that it was not uncommon for him to misplace files, he specifically testified that he "initially" put the array in the correct case folder. (Tr. at 177-178.) Therefore, in order for the array to end up in the incorrect folder, someone must have either accidentally or purposefully taken the array out of the correct case folder and placed it in an incorrect one. It seems improbable that someone would purposefully do so, and it is difficult to fathom—and Rosiak did not explain—how such a re-filing could be accidental.

Second, Rosiak testified that when the United States Attorney's Office first contacted him about the case, he was not sure he could find the photo array. (Tr. at 177.) Yet, he managed to rediscover the photo array shortly before testifying. This coincidence casts further doubt upon his already questionable testimony.

Third, Rosiak created this document electronically, using Microsoft Word. (Tr. at 176-78, 202.) Even if Rosiak had misplaced the hard copy, he should have searched for the electronic copy. The electronic file would contain metadata, including its creation date and last modified date. *See Latimer v. Roaring Toyz, Inc.*, 574 F. Supp. 2d 1265, 1269 n.6 (M.D. Fla. 2008) ("Examples of metadata for electronic documents include: . . . file dates (e.g., creation date, date of last data modification, date of last data access, and date of last metadata modification)"). The United States Attorney's Office for the Eastern District of New York is certainly no stranger to

computer searches and metadata. *See United States v. Graziano*, 558 F. Supp. 2d 304, 314 (E.D.N.Y. 2008). If Rosiak's testimony was truthful, one would expect that the government would still attempt to locate the electronic file because the metadata would corroborate his testimony. Such corroboration is particularly important given the questionable assertions about the alleged identification and Cross's concerns regarding the authenticity of the array. Under these circumstances, Rosiak and the government's failure to do so raises further suspicion. Indeed, the government has not submitted anything regarding the electronic file.

Rosiak and Babington also gave conflicting testimony about when the identification took place. Rosiak testified that the identification occurred after the first controlled buy. (Tr. at 157.) However, Babington testified that the identification occurred after the second controlled buy. (Tr. at 207.) Babington also gave conflicting accounts as to the identification procedure that was used. Initially, he testified that six different photos on six different pieces of paper were placed on a desk. One of those photos was of defendant. However, after going home and thinking about it, he wanted to "correct" his testimony and said that the array consisted of six photos on one piece of paper. (Tr. at 200-01.) In light of the inconsistencies in Babington's testimony and the government's overall late "discovery" of this evidence as well as additional statements made by defendant, the court finds it difficult to credit Babington's testimony.

The photo array itself raises further suspicion as to its legitimacy. It is an 8 1/2 x 11 inch piece of paper with six color pictures of African-American males. (Gov't. Ex. 7.) The only word on the document is "BLACK." (*Id*.) It is undated and unsigned. (*Id*.) It does not contain any information that identifies the case to which it relates. Neither Rosiak nor Babington signed the array as witnesses. The government alleges that the CI identified Cross by signing "BLACK," his alleged code name, under Cross's picture. (Tr. at 153.) However, the

government has not produced any corroborating evidence proving that this code-name "signature," which is printed in squiggly capital letters, matches the CI's handwriting. Nor is there any corroborating evidence that the CI's code name was indeed "BLACK." There are no notes or reports that memorialize this alleged identification. (Tr. at 176.) Rosiak claims that this failure was an "oversight." (*Id.*) The court finds it difficult to believe that an officer and a sergeant of the NYPD or their supervisors would permit such carelessness in preparing, conducting, and maintaining the photo-array identification. In other words, this degree of unprofessionalism strains credulity.

The court further shares Cross's suspicions about Rosiak and Babington's conduct following the alleged identification. According to Rosiak and Babington, the CI identified Cross as the individual at 551 Warwick Street who sold the CI marijuana, and Cross was the only person present. (Tr. at 23, 25.) The CI allegedly saw a firearm during those purchases. (Tr. at 25.) This establishes sufficient probable cause for an arrest warrant for Cross. However, Rosiak and Babington only obtained a search warrant for 551 Warwick Street. (Tr. at 26.) Furthermore, neither their application nor the search warrant mentions or describes Cross or any individual matching the physical description of Cross. In fact, the warrant application does not mention the photo identification. Cross raised these concerns in his post-hearing brief, but the government has not addressed them. While there may be legitimate reasons for not seeking an arrest warrant at the time and for leaving out Cross's identity in the application, the government has not set forth such reasons. It could have done so under seal along with the application and warrant. In light of the inconsistencies in the testimonies and the police and government's questionable conduct, the court finds that the government has not met its burden of proving that the photo-array identification ever took place.

## 2. The Government Failed to Show That the Events Immediately Preceding the Arrest Established Probable Cause.

Having excluded the photo-array, the only remaining source of probable cause for the arrest of Cross is the events of the morning of August 23, 2007. The government claims that Babington had probable cause for the arrest because: (1) Cross matched the description of the individual that Troiano saw fleeing from the rear of 551 Warwick Street during the execution of the search warrant; and (2) when Babington encountered Cross exiting from the private driveway of 472 Ashford Street, Cross, who was sweating profusely and out of breath, could not explain why he was there. (Tr. at 35; Gov't Opp'n of Oct. 20, 2008 at 16-17.) Cross testified that he was at 472 Ashford Street that morning trying to visit his girlfriend Christine. (Tr. 2 at 36.) He also testified that the first time he encountered the police on August 23, 2007, was when Troiano approached and arrested him. (Tr. 2 at 35, 39.) Based on the court's close observations of the witnesses and review of their testimonies, the court finds the government's account of the events to be highly suspect, rife with inconsistencies, and ultimately, less credible than Cross's account.

First, that morning, the police arrived with over fifteen officers, including two who allegedly were assigned to Ashford Street, which runs parallel behind 551 Warwick Street. Rosiak testified that these two officers were in a van. (Tr. at 181.) Rosiak had assigned these two officers to Ashford Street "in case somebody ran through the backyard and got out onto Ashford Street." (Tr. at 182.) It is somewhat puzzling that Babington, who was in charge of monitoring front-window security, would abandon his post to check on a commotion out back when there were better-positioned officers already posted behind the house on Ashford Street. None of these officers were produced to corroborate any of the police testimony.

Second, when Babington abandoned his post as front-window security, the ESU crew was still working on opening the front door and was vulnerable to threats from the window. The

15

court finds it odd that Babington would place his fellow officers in possible danger, particularly when there were better-positioned officers.

Third, Babington claims that when he heard noises from the rear of the house, he told Troiano that "we got to get someone back there." (Tr. at 51.) Then, Troiano abandoned his post as front-window security and circled around a row of houses in order to investigate the alleged noises. (Tr. at 51-52.) For the same reasons set forth above, the court finds this testimony incredible because, at the time, Troiano was also posted as front-window security with Babington. Notably, Troiano, who was initially situated near Babington, did not hear any noise from the rear. In light of the fact that ESU was having trouble knocking down the front door, the court is left to wonder how anyone could hear a noise coming from the rear of the house.

Fourth, even though Troiano allegedly saw the suspect jump over a fence toward Ashford Street, the only person he informed by radio was Babington. (Tr. at 106.) This does not make sense, as there were two officers allegedly already posted on Ashford Street. (Tr. at 181.)

Fifth, at the time Babington learned that the suspect was moving onto Ashford Street, he was still proceeding on Warwick Street toward Sutter Avenue. (Tr. at 33-34.) Yet, inexplicably, Babington did not alert the two officers on Ashford Street for assistance. Furthermore, the two officers on Ashford Street were in a van. (Tr. at 181.) Therefore, these officers were not only better positioned to intercept the fleeing suspect, they had the ability to do so more swiftly than Babington, who was on foot. Rosiak testified that all of the officers had radios that day and could speak "directly with one another." (Tr. at 113, 185.) While there may be plausible explanations for all of this conduct, the government has not provided it, as is its burden.

Sixth, the court also questions Troiano's purported observations of the alleged fleeing suspect. Troiano claims that he observed the suspect wearing a knit hat and a brown sweatshirt.

16

(Tr. at 113.) According to Troiano, the suspect was "looking around very antsy and very nervously." (Tr. at 104.) About three or four backyards separated Troiano from the suspect. (*Id.*) Chain-link fences separated each of those backyards (Tr. at 103, 110-111), which means that at least four and perhaps five or more layers of criss-crossing metallic chain links obstructed Troiano's view. Indeed, Troiano admitted that the fences partially obstructed his view because the fences were six-feet high whereas he is only five feet and eight inches tall. (Tr. at 103-106, 111.) While he claimed to have seen the individual make a motion as though he were tossing something over a fence, Troiano could not see what, if anything, was thrown. With so many layers of parallel fencing, it would have been quite a feat for him observe the suspect's clothing and demeanor.

Seventh, the diverging accounts of what followed the arrest cast further doubts on the police version of events. Rosiak testified that he and Babington drove Cross directly back to the station, as required by procedure. (Tr. at 188-89, 194.) Babington, on the other hand, testified that they first returned to 551 Warwick Street to search and retrieve the items from the house and the backyard before leaving for the precinct. (Tr. at 210.)

In contrast to the dubious testimony of the officers, the court found Cross's version of the events surrounding his arrest to be at least consistent and plausible. He gave clear and definite answers as to where he was, why he was there, where he was going, which officers he saw, who stopped him, what was said to him, and how he was taken to the precinct, including the kind of vehicle he was placed in and those who accompanied him. Indeed, the government's only argument for discrediting Cross's testimony regarding those events is that "it is unlikely that a person would be walking on a street at 7 a.m. for an unsolicited visit to a girlfriend whose last name is unknown to him." (Gov't Opp'n at 22.) The court does not find that such behavior is as

17

implausible as the government suggests, particularly in modern-day New York City.

In sum, the government has not met its burden for establishing probable cause for the arrest. As such, all of his post-arrest statements as well as the cash found on his person are suppressed as the fruits of an illegal arrest. Therefore, the court need not address the issue of whether Cross knowingly waived his *Miranda* rights or whether the array was unduly suggestive.

## III. Conclusion

The court is troubled by the government's handling of the discovery. The government produced its discovery in a piecemeal fashion throughout the suppression hearing, sometimes after it had already introduced inconsistent evidence. For example, the government waited until the eve of the hearing to inform the court that the CI is deceased. During the proceedings, the police would suddenly "remember" new statements by defendant or information about the photo identification and arrest. Tellingly, none of these newly "remembered" facts were memorialized in notes or reports, and, somehow, many of these new facts were incriminating. Under Rule 16, Cross was entitled to this discovery before the suppression hearing. The government's belated discovery, the nature of this discovery, and the piecemeal fashion in which the government produced the discovery, significantly calls into question the veracity of its assertions. Accordingly, for the reasons set forth above, Cross's motion to suppress is granted.

SO ORDERED.

Dated: Brooklyn, New York
      October 2, 2009

                                                          /s/
                                          DORA L. IRIZARRY
                                       United States District Judge